**SO ORDERED: October 16, 2012.**



*[signature]*

**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | Case No. 10-93904-BHL-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| FREDIN BROTHERS, INC., | ) | Adv. Pro. No. 11-59108 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANKERS BANK, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER DENYING PEOPLES BANK'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the motion for summary judgment [Doc. 42] filed by Peoples Bank ("Peoples"), by which Peoples seeks a determination that it is entitled to certain funds paid into the Court by the Plaintiff, Fredin Brothers, Inc. ("Fredin"). Peoples's motion is opposed by the chapter 11 trustee (the "Trustee") of the bankruptcy estate of Eastern Livestock

Co., LLC ("Eastern") and Fifth Third Bank ("Fifth Third"). Having considered these parties' briefs [*see* Docs. 60, 63, 71, and 73], along with the pleadings on record in this adversary proceeding, and being otherwise duly and sufficiently advised, the Court now **DENIES** Peoples's motion for the reasons set forth herein.

## Background

James and Carolyn Brass are Kansas farmers whose cattle operation was financed by Peoples. On August 31, 2010, the Brasses made and delivered a note to Peoples in the amount of $150,000 and executed a security agreement to secure their debt under the note, which provides for interest and the payment of Peoples's attorney fees and costs of collection. The security agreement encumbers, *inter alia*, the Brasses' "farm products including livestock and their young." The next day, Peoples filed a financing statement with the Kansas Secretary of State, disclosing a security interest in all the Brasses' inventory and farm products.

Before its demise, Eastern was one of the largest participants in the American cattle market, transacting for billions of dollars annually while acting in different capacities in different instances. For purposes of the instant motion it is sufficient to observe that principals and associates of Eastern were, for some time before and during the events at issue in the instant motion, engaged in a massive check kite.[1]

Nevertheless, in October 2010, Eastern enjoyed a prominent reputation in the cattle industry. On October 26, 2010, the Brasses sold 192 steers (the "192 Steers") to Eastern in exchange for a check in the amount of $157,606.47 drawn on Eastern's account at Fifth Third and made payable to Mr. Brass and Peoples (the "Check"). There is a dispute in the record about

---

[1] ELC's owner, Thomas P. Gibson, and two other associates of ELC pled guilty to one count of criminal syndication and 172 counts of theft in the Circuit Court of Metcalfe County, Kentucky, in March 2012. Mr. Gibson and another associate face pending charges of wire fraud in the United States District Court for the Western District of Kentucky.

what happened next,[2] though the disagreement is immaterial to the motion at bar: Peoples maintains that Eastern sold the 192 Steers to Hohenberger Cattle ("Hohenberger"), which in turn sold them to Fredin, the interpleader plaintiff herein, which then sold them on down the supply chain. Meanwhile, Fifth Third dishonored Eastern's outstanding checks, including the Check with which Eastern paid for the 192 Steers. Fredin, which had not yet paid Hohenberger for the 192 Steers, learned of Eastern's troubles and, fearing the prospect of having to pay twice for the cattle it purchased from Hohenberger, filed an interpleader action in Colorado state court on November 10, 2010, pursuant to which it paid into the court $423,184.07 that it nominally owed Hohenberger for cattle purchases. Of this amount, $165,856.52 (the "192 Steer Proceeds") was owed by Fredin for the purchase of the 192 Steers. Mr. Brass, Eastern, and Fifth Third were among the thirteen defendants named by Fredin in its interpleader suit.

Soon thereafter, on December 6, 2010, other of Eastern's creditors filed an involuntary petition against Eastern in this Court under chapter 11 of the Bankruptcy Code. In the spring of 2011, after the pleadings had closed, the Trustee sought and obtained first the removal of the interpleader action and associated funds from the Colorado state court to the United States Bankruptcy Court for the District of Colorado, and then the transfer of the case and funds to this Court. Fredin later disclaimed any interest in the interpleaded funds and obtained a discharge of its liability related to the facts underlying the case, leaving the defendants and intervenors to fight over the interpleaded funds.

### **Standard of Review**

Summary judgment is mandated where there are no disputed issues of material fact and the movant must prevail as a matter of law. Fed. R. Civ. P. 56(a); *see Dempsey v. Atchison,*

---

[2] In its answer [Doc. 93], Hohenberger asserts that it bought the 192 Steers not from Eastern but from an entity called E-4.

3

*Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must affirmatively show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex*, 477 U.S. at 323; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When reviewing facts in support of a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving parties and draw all legitimate inferences and resolve all doubts in their favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *NLFC, Inc. v. Devcom Mid-American, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). The court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but rather to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249.

## Discussion

Peoples, by its motion, seeks a determination that its security interest in the 192 Steers extends to the 192 Steer Proceeds based on Kansas's Uniform Commercial Code, Kan. Stat. Ann. §§ 84-1-101 *et seq*.

The Trustee and Fifth Third, which had a security interest in substantially all of ELC's assets, between them raise three objections. Preliminarily, the Trustee argues that the documents

4

submitted by Peoples in support of its motion should not be considered because they have not been properly authenticated. Second, they argue that there is a question of material fact as to whether the Food Security Act of 1985 (the "FSA"), 7 U.S.C. § 1631, applies to preempt the Kansas UCC and extinguish Peoples's security interest. Third, the Trustee argues that even if the FSA does not apply, Peoples has not established that it is entitled to judgment under state law. Also, Hohenberger, who has inexplicably failed to oppose the motion at bar, has pleaded a claim to the funds that is at odds with Peoples's, and the Court will consider its position in making its disposition. The first and second of the formal objections are addressed below; because the Court determines that the second objection and the position taken by Hohenberger defeat Peoples's claim to summary judgment, the third formal objection is not considered herein.

*Authentication of Peoples's Supporting Materials*

Peoples did not append the usual affidavit of authenticity to its motion for summary judgment; rather, the motion itself contains a sworn, notarized verification[3] by Peoples's president that the facts alleged in the motion are "true and correct to the best of my knowledge," and that the supporting materials "are true and correct copies and are from the files of Peoples Bank." The Trustee maintains that this is inadequate because the verification contains the qualifier "to the best of my knowledge" and because it otherwise fails to demonstrate that Peoples's president would be qualified to introduce the supporting materials as evidence at trial.

Fed. R. Civ. P. 56 applies to motions for summary judgment in adversary proceedings in

---

[3] It is irrelevant that the averment by Peoples's president is in the form of a verified complaint rather than the more customary stand-alone affidavit because "28 U.S.C. § 1746 provides, in relevant part, that '[w]herever, under any law of the United States or under any rule… made pursuant to law, any matter is required or permitted to be supported… by… affidavit, such matter may, with like force and effect, be supported… by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true *under penalty of perjury*....'" *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000) (original emphasis and ellipses). Peoples's president's verification meets those statutory criteria.

5

bankruptcy. Fed. R. Bankr. P. 7056. The rule provides that "[a]n affidavit or declaration used to support… a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (observing that the rule "incorporates evidence rule 602 in words as well as by reference"). Where a litigant's verification is "based upon his own personal knowledge *or* upon his information and belief… it is insufficient" because it does not "show affirmatively that the affiant is competent to testify to the matters stated therein." *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (emphasis added and internal quotations omitted).

The verification by Peoples's president contains no subjunctive escape clause like the one at issue in *Price*, *see Id.* at 832, but is said to be based upon his "personal knowledge of factual content thereof;" it leaves no room to conclude that he is relaying secondhand information. That the veracity of Peoples's allegations is affirmed "to the best of my knowledge" is of no moment, since "'personal knowledge' includes inferences," and "all knowledge is inferential," *Visser*, 924 F.2d at 659. The factual allegations contained in Peoples's motion are properly supported by Peoples's president's verification, and pass muster under Fed. R. Civ. P. 56(c)(4).

The rules further require that, when challenged, a "party asserting that a fact cannot be… genuinely disputed must support the assertion by citing to particular parts of materials… presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1)-(2). Here, the five documents in question are business records consisting of (i) the note made by the Brasses in favor of Peoples, (ii) the related security agreement, (iii) a receipt from the Kansas Secretary of State acknowledging the filing of a collateral amendment to Peoples's UCC financing statement, (iv) a purchase invoice for the Steers apparently composed by an agent of

6

ELC, and (v) a copy of the dishonored Check. In order to fit within the hearsay exception for business records, the reliability of such records must be "shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6)(D).

The president of Peoples swears under penalty of perjury that "the attached Exhibits are true and correct copies." The president's knowledge of the authenticity of the note and security agreement seems beyond question, since he executed those documents on behalf of Peoples. The remaining items are records one would expect a bank to maintain, and "have sufficient indicia of trustworthiness to be considered reliable." *See Woods v. City of Chicago*, 234 F.3d 979,988 (7th Cir. 2000). This is not a circumstance like that confronted by the district court in *Pitcher v. Principal Mut. Life Ins. Co.*, 870 F.Supp. 903, 916 (S.D. Ind. 1994), where plaintiff's counsel himself sought to authenticate his client's medical bills. On the contrary, the Court is satisfied that Peoples's president would be qualified to introduce them at trial by virtue of his position within the bank and his personal involvement in the transaction at issue.

### *The UCC and the Food Security Act*

Peoples's argument is based entirely on the Kansas UCC.[4] According to Peoples, Eastern purchased the 192 Steers subject to Peoples's perfected security interest. *See* UCC § 9-201(a) (providing generally that "a security agreement is effective according to its terms… against purchasers of collateral…"). That security interest, according to Peoples, attached to the proceeds of the 192 Steers, which are now in the possession of the Court, *see* UCC §§9-203(f) and 9-315(a)(2) (providing generally that a security interest attaches to proceeds of collateral), and was perfected by operation of law, *see* UCC § 9-315(c) (providing generally that "a security

---

[4] The Court assumes, *arguendo*, that the law of Kansas applies to the transaction at issue. Fifth Third and the Trustee contest this, though no party has argued that the differences among the relevant states' versions of the UCC are material to the issue at bar. Accordingly, the Court will cite to UCC Article 2 and UCC Revised Article 9 as promulgated by the National Conference of Commissioners on Uniform State Laws and the American Law Institute.

7

interest in proceeds is [] perfected [] if the security interest in the original collateral was perfected"). Finally, according to Peoples, its security interest in the proceeds of the 192 Steers is entitled to priority over Fifth Third's blanket lien on Eastern's assets because it was perfected before the 192 Steers were transferred from Brass to Eastern. *See* UCC §§ 9-322 (providing generally that priority among conflicting security interests is determined by time of perfection) and 9-325(a) (providing generally that a security interest created by a buyer is subordinate to a perfected security interest created by a seller).

Even without considering the FSA, Peoples's analysis of the UCC is incomplete and does not address relevant UCC provisions relating to the sale of goods subject to a security interest. Without a fuller consideration of the qualified exception created by those provisions, Congress's impetus for passing the FSA, which may well be fatal to Peoples's claim to the 192 Steers Proceeds, remains clouded.

By its terms, UCC § 9-315, upon which Peoples relies as authority for the proposition that it retains a security interest in the 192 Steers Proceeds, is qualified by UCC § 2-403(2), which provides that a merchant who has been entrusted with goods has the power to transfer them in the ordinary course of its business free and clear of encumbrances it created.[5] Similarly, UCC § 9-320(a) provides that a buyer of goods in the ordinary course of business generally "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."

However, the UCC's exceptional treatment of security interests in goods sold in the ordinary course is itself subject to an exception. The farm products exception explicitly excepts

---

[5] UCC § 2-403 provides, *inter alia*, that: "(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." The subsequent paragraph explains that "(3) 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence…." UCC § 2-403.

from the reach of UCC § 9-320 those who buy "farm products from a person engaged in farming operations."

Congress found that the UCC's farm products exception often worked an injustice on unwitting purchasers of encumbered goods who were subject to double payment when sellers failed to satisfy their obligations to lenders, and that such exposure burdened interstate commerce. 7 U.S.C. § 1631(a). In response, the FSA was passed in 1985. P.L. 99-198, Title XIII, § 1324. *See generally First Nat'l Bank & Trust v. Miami Cnty. Coop. Ass'n*, 897 P.2d 144, 146-47 (Kan. 1995) (discussing the history of the FSA). The FSA preempts the UCC farm products exception, *Id.* at 147, and provides that one who buys agricultural commodities in the ordinary course of business from a person engaged in farming operations takes free of perfected security interest unless the secured party takes certain prescribed measures to notify prospective buyers and ensure the preservation of its security interest, 7 U.S.C. § 1631(c)(1), (5), (d). In order to ensure that such a security interest is not extinguished by a sale, a secured party must either (i) provide to the buyer prior to a sale direct notice that satisfies several enumerated criteria, 7 U.S.C. § 1631(e)(1), or (ii) file an "effective financing statement" with the secretary of state if the appropriate state has established a centralized filing system pursuant to the FSA, 7 U.S.C. § 1631(e)(2), (3). Anticipating a scenario featuring a seller who receives good payment from a buyer and nevertheless defaults on its obligation to its lender, the FSA was thus intended to "shift[] the burden of potential loss from the buyers and commission merchants to the lenders who finance farm operations." *Mercantile Bank of Springfield v. Joplin Reg'l Stockyards, Inc.*, 870 F.Supp. 278, 282 (W.D. Mo. 1994).

In its papers, Peoples does not attempt to demonstrate its compliance with the FSA's notice provisions. In reply to the objections of Fifth Third and the Trustee, Peoples shifts gears

9

and argues for the first time that neither the FSA nor UCC § 9-320 applies because Eastern was not a buyer in the ordinary course of business within the meaning of either statute because it paid for the 192 Steers with the subsequently dishonored Check. Rather, Peoples maintains that its arguments and proffer of evidence are sufficient to shift the burden to the Trustee, who must prove that Eastern was a buyer in the ordinary course. *See United States v. Cont'l Ill. Nat'l Bank & Trust*, 889 F.2d 1248, 1253 (2d Cir. 1989) (holding that a plaintiff need not disprove buyer status); *Gary Aircraft Corp. v. Gen. Dynamics Corp.*, 681 F.2d 365, 373 (5th Cir. 1982) (observing that "the burden of proof does rest with the party claiming the status of a buyer in the ordinary course of business"). Peoples puts its adversaries and the Court at a disadvantage by raising in its reply brief novel arguments that the Trustee has not had an opportunity to address. Nevertheless, Peoples cites persuasive authority for the proposition that a party's status as buyer in the ordinary course is its to prove and not its adversary's to disprove. Accordingly, the Court considers the question briefly in the light most favorable to the non-movants and concludes that the application of the FSA to the transaction between the Brasses and Eastern remains an unanswered mixed question of fact and law.

The FSA defines "buyer in the ordinary course of business" as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products." 7 U.S.C. § 1631(c)(1). The statutory definition is unavailing, since the only other relevant term defined by the FSA is "farm product," which means "… a species of livestock such as cattle… used or produced in farming operations… that is in the possession of a person engaged in farming operations." 7 U.S.C. § 1631(c)(5). The FSA begs the question of the meaning of "ordinary course of business" and "buys." The Court is unaware of any published opinions parsing the FSA's use of the term. One commentator has

10

suggested that courts refer to the UCC definition and the cases interpreting it for guidance. *See* Keith G. Meyer, *A Garden Variety of UCC Issues Dealing with Agriculture*, 58 U. Kan. L. Rev. 1119, 1159 (2010) (proposing interpretation of the FSA provision by reference to UCC cases).

The Court observes that perhaps at least one difference between the FSA and UCC definitions of "buyer in the ordinary course of business" is material. To qualify as a buyer in the ordinary course of business under the UCC, one must "buy goods in good faith." UCC § 1-201(9). This language has been a part of the UCC's definition since its inception, having survived two major revisions. In contrast, the FSA includes no explicit good-faith requirement. At this juncture, without the benefit of briefing on the question by the non-moving parties, the Court is unwilling to hazard a definitive opinion on whether a good-faith element should be read into the FSA, and, if so, whether the UCC's definition of "good faith" is applicable, *see* UCC § 1-201(19) (defining "good faith" as "honesty in fact in the conduct or the transaction concerned"). If it is appropriate to read a good-faith requirement into the FSA, it is unclear whether Eastern's conduct satisfies the requirement, and evidence will need to be presented. If the FSA should not be so construed, then Peoples has not shown that the federal statute does not bar its recovery.

Peoples's failure to demonstrate that the FSA did not extinguish its security interest when the Brasses transacted with Eastern applies *a fortiori* to the subsequent purchase of the 192 Steers by Hohenberger. By its answer, Hohenberger asserts facts that would support its status as a buyer in the ordinary course of business entitled to the protections of the FSA, and Peoples has put forth no argument to the contrary.

## Conclusion

For the reasons set forth herein, the motion for summary judgment filed by Peoples Bank

is DENIED.

    IT IS SO ORDERED.

###